**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael Roy SHIVELY, Kim Renee
Shively and George Russell
Johnson, Defendants–Appellants.**

No. 90–8085.

United States Court of Appeals,
Fifth Circuit.

March 15, 1991.

Paul Williams (court appointed), Midland, Tex., for Michael Shively.

Ray P. Moudy (court appointed), Midland, Tex., for Kim Shively.

Thomas S. Morgan (court appointed), Midland, Tex., for Johnson.

Philip Police, Leroy Morgan Jahn, Asst. U.S. Attys., Ronald F. Ederer, U.S. Atty., San Antonio, Tex., for the U.S.

Before CLARK, Chief Judge, RONEY * and DUHÉ, Circuit Judges.

CLARK, Chief Judge:

Michael Roy Shively (Shively or Mike Shively), Kim Renee Shively (Renee Shively) and George Russell Johnson (Johnson) were tried on a wide-ranging sixteen count indictment alleging, among other things, conspiracy, arson and various fraudulent acts. The jury returned a verdict of guilt as to every count. The defendants raise numerous and disparate issues on this appeal from their convictions and sentences. We affirm the judgment of the district court in every regard except for the convictions of Mike and Renee Shively for witness intimidation. We reverse their convictions on that count and remand for resentencing.

I

On June 22, 1984, Mike and Renee Shively were vacationing in New Mexico. At approximately 2:00 a.m. their residence in Odessa, Texas, caught fire, the damage being confined to the kitchen, garage, and an automobile parked in the garage. Earlier in June, a neighbor had observed a U–Haul trailer at the residence. Unidentified men were carrying items from the house into the trailer. On the evening of June 21, four hours before the fire, this same neighbor observed a Lincoln Continental stopped at or near the home, with three or four occupants. Fire investigators discovered clear evidence of arson.

Upon their return from New Mexico the next day, the Shivelys initially denied that anyone had been staying at their home. Nevertheless, telephone records later revealed that someone had called their home several times from their hotel room in New Mexico. It was thereafter determined that Johnson, a long-time friend of Mike Shively, rented a Lincoln Continental in Arkansas, drove to Odessa several days before the fire, and returned the car on June 24. Johnson admitted that he had been present at the residence on the night of the fire. Mike Shively later told an employee that he and Johnson caused the blaze.

Although fire investigators found no evidence of forced entry, the Shivelys reported the fire as a burglary and arson to their insurance company. They submitted a claim for theft and fire loss of $84,540, but the insurance company refused to pay because it suspected insurance fraud. The Shivelys sued the insurance company in state court, ultimately settling their claim for $25,000. This settlement followed the deposition of Ronnie Coplen, one of Mike Shively's employees, who corroborated Shively's version of the fire and the items lost. Coplen was later a witness for the prosecution who testified at the criminal trial.

Investigators from the Bureau of Alcohol, Tobacco and Firearms (ATF) and the FBI began looking into the fire. During the course of this investigation, they discovered that Mike Shively had several unpaid judgments from Louisiana courts dating from the late 1970s and early 1980s. They also found evidence that he had on several occasions altered his social security number to obtain credit for himself and for Best Services, a trucking company he operated. Johnson also apparently altered his social security number to open a bank account when he moved to Odessa in 1985.

The investigators discovered evidence that in 1984 and 1985, Mike Shively and

* Circuit Judge of the Eleventh Circuit, sitting by designation.

Johnson defrauded KBK Financial, Inc., (KBK) a Houston company that purchased accounts receivable from Best Services. Finally, the investigators were informed that Mike and Renee Shively had threatened Ronnie Coplen and his wife at a time when Coplen was a witness in the Shivelys' state court proceeding against their insurance company.

A federal grand jury returned a ten-count indictment against the Shivelys and Johnson on June 15, 1989, almost five years after the fire. Superseding indictments on August 31 and November 2 realleged the previous counts and added others. The government went to trial on the sixteen counts alleged in the November 2 indictment. Count 1 charged that the Shivelys and Johnson conspired to destroy by fire the Shively residence and a vehicle parked therein. Count 2 charged the three with the substantive arson offense. Counts 3 through 7 charged Mike Shively with fraudulent use of a social security number not his own to obtain credit. Count 8 charged Johnson with fraudulent use of a social security number not his own to establish an account at a Midland bank. Count 9 charged Mike and Renee Shively with intimidating a witness. Count 10 charged the three with wire fraud related to the arson. Counts 11, 12, 14, 15, and 16 charged Mike Shively and Johnson with mail fraud. Count 13 charged Mike Shively and Johnson with receiving and disposing of currency that had moved in interstate commerce, knowing it to be stolen, unlawfully converted, and taken by fraud.

A jury convicted the Shivelys and Johnson under all counts of the November indictment. Mike Shively was sentenced to consecutive five-year terms on counts 1, 2, 9, and 10. Concurrent five-year terms imposed on the remaining counts were suspended on condition of satisfactory service of a five-year term of probation to commence after expiration of his consecutive prison terms. Renee Shively received three-year terms of imprisonment on each of counts 1, 2, 9, and 10. The court suspended execution of the prison terms imposed on counts 2, 9 and 10, which were concurrent to each other but consecutive to

count 1, on condition of satisfactory service of a three-year term of probation to follow her imprisonment on count 1. Johnson was sentenced to the following consecutive terms of imprisonment: five years for count 1, ten years for count 2, and five years for count 10. On Johnson's other convictions, the court imposed suspended, concurrent five-year terms of imprisonment and five years on probation following his release from prison. All three were ordered to make restitution and to pay special assessments.

## II

### Sufficiency of the Evidence

Through various arguments, all three defendants challenge in some way the sufficiency of the evidence supporting conviction under counts 1, 2, 3, 6, 9, 10, 12, 14, 15, and 16. On any such challenge, the evidence is sufficient if a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. When reviewing the sufficiency of the evidence to support a conviction, the facts and all reasonable inferences therefrom will be viewed in the light most favorable to the finding of guilt. *United States v. Rodriguez-Mireles*, 896 F.2d 890, 892 (5th Cir. 1990).

#### 1. Counts 1 and 2

Count 1 charged all three defendants with conspiracy to destroy by fire the Shivelys' home and automobile to collect and share in the insurance proceeds, in violation of 18 U.S.C. §§ 371, 844(i). Count 2 charged them all with the substantive arson, in violation of 18 U.S.C. § 844(i). The substantive statute subjects to criminal penalty any person who "maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." 18 U.S.C. § 844(i). Mike Shively and Johnson both argue that this statute does not cover their crime, asserting that the resi-

808

dence and automobile were private, not commercial, and therefore were not used in, and did not affect, interstate commerce.

For this argument, Shively and Johnson rely primarily upon *United States v. Mennuti*, 639 F.2d 107 (2d Cir.1981), and *United States v. Monholland*, 607 F.2d 1311, 1314–16 (10th Cir.1979), both of which narrowly construed the interstate commerce nexus required by this statute in regard to private residences and vehicles. *Mennuti* and *Monholland*, however, predated the Supreme Court's recent pronouncements on this statute, which indicated that the sweep of § 844(i) is co-extensive with the outer limit of congressional power under the Commerce Clause. *See Russell v. United States*, 471 U.S. 858, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985). Specifically, the Supreme Court determined that an expansive construction was required because both the phrasing of the statute and its legislative history express "an intent by Congress to exercise its full power under the Commerce Clause." *Id.* at 859, 105 S.Ct. at 2456 (footnote omitted). In the wake of *Russell*, we have previously questioned the interpretation given this statute in *Mennuti* and *Monholland*. *See United States v. Patterson*, 792 F.2d 531, 534–36 (5th Cir.), *cert. denied*, 479 U.S. 865, 107 S.Ct. 220, 93 L.Ed.2d 149 (1986). In *Patterson*, we determined that property is "used" within the meaning of § 844(i) when it has "some relationship" to an activity alleged to affect interstate commerce. *Id.* at 534.

Even a *de minimis* effect on interstate commerce will suffice to support Congress' ability to enact a criminal statute under the Commerce Clause. *United States v. Stillwell*, 900 F.2d 1104, 1110 (7th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 111, 112 L.Ed.2d 81 (1990). In *Stillwell*, the Seventh Circuit determined that *Russell* compelled the conclusion that "Congress intended § 844(i) to reach every private residence it constitutionally has the power to reach, whether or not the residence is used for commercial purposes." *Id.* at 1109. As such, the statute could constitutionally be applied to arson of a private residence with no business purpose whatsoever, where the only nexus between the resi-

dence and interstate commerce was the supply of natural gas from sources outside of the state. *Id.* at 1111–12. By this reasoning, the government urges that the interstate telephone service utilized at the Shively home would establish a sufficient nexus.

We need not go so far here. In *Russell*, the Supreme Court noted that "Congress at least intended to protect all business property, as well as some additional property that might not fit that description, *but perhaps not every private home.*" *Russell*, 471 U.S. at 862, 105 S.Ct. at 2457 (emphasis added). As such, the Court looked first for business characteristics linking the structure to interstate commerce. Finding such a link, its inquiry was at an end. *Id.* (rental of real estate unquestionably uses property in activity affecting interstate commerce).

Both the home and the automobile had at least "some relationship" to Mike Shively's trucking business, which he concedes was involved in, or at least affected, interstate commerce. The automobile was a company vehicle, leased in the name of his company and not himself personally. With respect to the residence, mortgage payments were made from his company's checking account, as were telephone and electric bills. He also kept up to $100,000 of business funds at the house to make advances on short notice to his drivers over weekends and holidays. Drivers from out of town on brief layovers would frequently stay at the house when in Odessa. Because of the expansive interpretation given to § 844(i), these contacts are sufficient to indicate that the arson of this home and automobile were proscribed by Congress.

█ In a single paragraph attacking Counts 1 and 2, Renee Shively asserts that no evidence links her either to the conspiracy or to the actual arson. She does not contest the evidence supporting the substantive conviction of her husband and Johnson; therefore, a valid conspiracy conviction will sustain her own § 844(i) conviction under a vicarious liability theory, which was submitted to the jury. *See*

*Pinkerton v. United States*, 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946). Evidence of conspiracy is sufficient if the government proves that two or more persons agreed to commit a crime and at least one conspirator committed an overt act in furtherance of the agreement. *United States v. Weddell*, 800 F.2d 1404, 1407, *amended*, 804 F.2d 1343 (5th Cir.1986). Furthermore, every element of conspiracy may be inferred by the jury from circumstantial evidence. *United States v. Schmick*, 904 F.2d 936, 941 (5th Cir.1990), *cert. denied sub nom. Brewer v. United States*, —— U.S. ——, 111 S.Ct. 782, 112 L.Ed.2d 845 (1991). Thus, the agreement itself may be inferred from a "concert of action." *Id.*

With these principles in mind, and viewing the evidence in the light most favorable to the verdict of guilt against her, the evidence is more than sufficient. She does not dispute the fact that the fire was set by arson. On the night of the blaze, telephone calls were made from her hotel room in New Mexico to the Shively residence, which she initially told investigators was unoccupied during their vacation. Two weeks before their trip, a U–Haul was seen loading in front of the Shivelys' home, of which the jury could infer she must have been aware. After the fire, the home was found to contain no family photographs or mementos, and one investigator opined the house did not appear "lived in." Both investigators and neighbors testified that her reaction to the fire immediately upon return exhibited no great concern. She did not cry or appear depressed, and she did not check the house to determine its condition. Furthermore, she was involved in the transparent insurance fraud which was the aim of the charged conspiracy. Over a period of three weeks following the fire, she continually supplemented the "loss" incurred by the "burglary" and fire to include numerous expensive items, including among many others, hand-carved wood frames valued at $5000, a $2500 llama rug, a $3200 mink coat, and a $3500 diamond-encrusted gold Bulova watch. In her civil deposition read at trial, she stated only that a "good friend" had given her these items, although she never identified this mystery person. Her cousin, Mike Shively's former wife, testified that Renee Shively moved in with them owning nothing but her scant personal clothes. These circumstances are sufficient to support the jury's conclusion that she was both aware of and a participant in the conspiracy to burn the home and share in the insurance proceeds.

### 2. Counts 3 and 6

■ Counts 3 through 7 of the indictment alleged that on five separate occasions Mike Shively fraudulently used a social security number not his own to obtain credit, each time violating 42 U.S.C. § 408(g)(2). To obtain conviction under this statute, the government must prove "that defendant (1) for any purpose, (2) with intent to deceive, (3) represented a particular social security account number to be his or another person's, (4) which representation was false." *United States v. Darrell*, 828 F.2d 644, 647 (10th Cir. 1987). Shively contends that insufficient evidence was adduced to convict him on counts 3 and 6.

Shively's social security number is 437–62–6026. In 1978, he disclosed this number as part of a credit check to lease heavy trucks in Louisiana. The rental company ultimately terminated the leases for non-payment and filed suit to collect outstanding judgments. Beginning with a checking account Shively opened upon his move to Odessa, incorrect social security numbers appeared on forms for the purchase of his residence, credit applications for several Ford trucks and a motorcycle, and bank loans and notes. Count 3 concerns a bank loan of $10,000 to purchase trucking licenses from a corporation that had entered into bankruptcy. The bank extended credit prior to loan application, but the subsequently submitted application listed the social security number as 437–60–6006. It was signed by Shively and dated July 10, 1984. Count 6 concerns the lease of a Cadillac El Dorado. Shively's signature appears on the "Lessee Statement," which bears social security number 477–60–6026.

Regarding count 3, Shively states that the "uncontroverted evidence" established that he signed the loan application "in blank," and that all the information was filled in later by someone else. This evidence consists of his own statements during a deposition in a civil suit filed by the bank to recover this defaulted loan. The jury was free to disregard his testimony, especially in view of a bank officer's testimony that the credit application was given after approval of the loan. This application is hand-dated, and apparently the same pen signed both the date and Shively's name. The inferences from this evidence are sufficient to support conviction under count 3.

Regarding count 6, Shively contends the evidence demonstrated that the social security number on the loan application came not from him, but rather from some prior file. The sales manager did testify he obtained his information from a prior file. This fact cuts no figure here, however. The sales manager explained Shively had "four deals on record" at the car dealership. The jury could infer that the incorrect number got into the file by Shively's own misrepresentation. In any event, Shively certified as accurate all of the information on the form for that automobile's purchase. This evidence is sufficient to overcome the possibility of an innocent mistake. The jury could reasonably conclude that Shively intentionally misrepresented his social security number to deceive the dealership to obtain the vehicle.

3. Count 9

■ In relevant part, 18 U.S.C. § 1512, states:

(b) Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

(1) influence, delay, or prevent the testimony of any person in an official proceeding;

(2) cause or induce any person to—

(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

(B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

(C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

(D) be absent from an official proceeding to which such person has been summoned by legal process; or

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;

shall be fined not more than $250,000 or imprisoned not more than ten years, or both.

18 U.S.C. § 1512(b)(1). For purposes of this statute, an "official proceeding" is defined as a proceeding before, among other things, various federal judges, magistrates and courts, or a federal grand jury. *Id.* § 1515(a)(1).

Count 9 of the indictment alleged that Mike and Renee Shively "did unlawfully and knowingly threaten and intimidate Ronnie Gene Coplen and Marsha Coplen with the intent to influence and prevent the truthful testimony of Ronnie Gene Coplen in an official proceeding," in violation of 18 U.S.C. § 1512. Mike Shively contends there was no evidence presented that his intimidation of Ronnie Coplen involved an official proceeding. Renee Shively challenges the general sufficiency of the evidence regarding her conviction on this count.

Ronnie Coplen is a former Best Services office employee. His wife, Marsha Coplen, testified that in late June or early July 1985, nearly one year after the fire, Renee Shively called her and stated that "she was looking for Ronnie, and when I didn't know

where he was, she stated the fact that for me not to go anywhere with him or my daughter, not to be seen in the truck with him, that she wouldn't be responsible for what happened to us." Marsha Coplen interpreted this as a threat to herself as well as her husband. Shortly thereafter, Ronnie Coplen went to the Odessa police and submitted an affidavit that Mike Shively had admitted committing the arson with Johnson. He also reported that Mike Shively expressed an intent to kill a state fire investigator and an insurance claims representative.

In January 1987, Mike Shively and Johnson took Coplen "for a ride." Coplen testified that Shively carried a pistol, and as they drove around for over an hour, the two demanded that he "be a witness" and "more or less, lie to the insurance company" regarding the Shivelys' state court suit against the insurance company. Coplen testified the two "told me what they wanted me to say" and insinuated that his refusal would result in harm to his family. Shively and Johnson returned the next day to drive him to his deposition, and watched him testify as rehearsed.

This intimidation preceded by two and one-half years the filing of the first grand jury indictment against the Shivelys. In its brief on this point, the government is obscure about the exact parameters and dates of the federal investigation. It relies exclusively upon the testimony of state fire investigator Womack to establish that both the requisite official proceeding and the Shivelys' intent to influence it existed. Womack testified he enlisted the ATF in the investigation in September 1984, some ten months before Renee Shively's telephonic threat to Marsha Coplen. Womack testified that when he subsequently interviewed Johnson, he told him that ATF was participating in the investigation. From this the government concludes a reasonable jury would necessarily believe that Johnson passed that information to his co-conspirators, Mike and Renee Shively. The government urges that the jury could have determined that one purpose for intimidating the Coplens was to deter Ronnie Coplen "from testifying honestly before any federal grand jury that might be convened." The government concedes that the record is silent as to the date that a federal grand jury actually began investigating the case. The record does not disclose whether either of the Coplens testified before the grand jury, nor whether the prosecution ever contemplated such testimony.

Section 1512 "reaches only certain specifically enumerated types of witness tampering; other types of conduct, no matter how morally reprehensible, are not prohibited by the statute." *United States v. Dawlett,* 787 F.2d 771, 775 (1st Cir.1986); *see generally United States v. Wesley,* 748 F.2d 962, 964 (5th Cir.), *cert. denied sub nom. Cooper v. United States,* 471 U.S. 1130, 105 S.Ct. 2664, 86 L.Ed.2d 281 (1984) (discussing enactment of § 1512). An intent to influence testimony in a state civil suit is clearly not within the ambit of this statute. While the evidence does show the intimidation of a witness, it was not done, as required by statute, "with intent to ... influence, delay, or prevent testimony of any person *in an official proceeding.*" 18 U.S.C. § 1512(b)(1) (emphasis added).

Under this statute intent may, and generally must, be proven circumstantially. *United States v. Maggitt,* 784 F.2d 590, 593 (5th Cir.1986). "In determining whether a threat was intended to influence future conduct under 18 U.S.C. § 1512, it is the endeavor to bring about a forbidden result and not the success in actually achieving the result that is forbidden." *Id.* However, under § 1512(b)(1), what is forbidden is actual or attempted witness tampering with intent to affect testimony in an official (federal) proceeding.

The indictment states the intimidation occurred "on or about and between the dates of July 18, 1985 and January 12, 1987." July 18 was the day Renee Shively telephoned Marsha Coplen, discussed *infra.* January 12 was the night Mike Shively and Johnson took Coplen "for a ride." No proof was made of any intimidation between or beyond these two dates. The government presented no evidence that Mike Shively's intent on the night of January 12 was anything other than to influ-

ence the state civil proceedings he instituted in 1984 against his insurance company. Coplen's testimony at trial recounting the intimidation and his subsequent deposition the next day clearly confirm this. This evidence is too thin to support conviction under a statute enumerating a specific intent crime to affect an "official proceeding," limited by statute to enumerated federal proceedings.

At best, Renee Shively's threat attempted to prevent Ronnie Coplen from going to the Odessa police. We note that 18 U.S.C. § 1512(b)(3) speaks more broadly to proscribe intimidation designed to "hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense." Whether the conduct of Mike or Renee Shively fell within this subsection is not before this court. The government proceeded under an indictment respecting "the intent to influence and prevent the truthful testimony ... in an official proceeding," which limits this charge by its terms to § 1512(b)(1). Furthermore, although not controlling our decision here regarding either defendant, we note that the First Circuit reversed a conviction and remanded with instructions to dismiss an indictment, like the one here, which "did not identify *any* proceeding in which defendants were allegedly attempting to influence [the person's] testimony." *United States v. Murphy*, 762 F.2d 1151, 1154 (1st Cir.1985) (emphasis original). As such, the indictment did not adequately apprise the defendants of the charges against them. *Id.* at 1155.

In support of the convictions, the government points to the Sixth Circuit's decision in *United States v. Scaife*, 749 F.2d 338, 348 (6th Cir.1984), where the court determined that the government is not required to prove that grand jury proceedings were pending or about to be instituted at the time of the threats or intimidation. Besides being explicitly stated as such by § 1512(e)(1), this follows naturally from construction of the prohibited conduct under § 1512(b), which forbids intimidation of "any person," not just witnesses. *See*

*United States v. Risken*, 788 F.2d 1361, 1368 (8th Cir.), *cert. denied*, 479 U.S. 923, 107 S.Ct. 329, 93 L.Ed.2d 302 (1986). In *Scaife*, the court also held that the government need not prove the defendant knew that a federal grand jury or federal law enforcement officers were involved, citing § 1512(f). *Scaife*, 749 F.2d at 348. This subsection states:

> (f) In a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance—
>
>> (1) that the official proceeding before a judge, court, magistrate, grand jury, or government agency is before a judge or court of the United States, a United States magistrate, a bankruptcy judge, a Federal grand jury, or a Federal Government agency; or
>>
>> (2) that the judge is a judge of the United States or that the law enforcement officer is an officer or employee of the Federal Government or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant.

18 U.S.C. § 1512(f).

*Scaife* does not support the government's contention here that it need only demonstrate intimidation that could prevent a witness "from testifying honestly before any federal grand jury that might be convened." *Scaife* holds that a defendant need not actually know that an "official proceeding" has been or is about to be instituted, and that the defendant's intent does not depend upon knowledge of the federal nature of the proceeding intended to be affected. *Scaife* does not obviate every facet of the government's obligation to prove intent under § 1512. A defendant can act without knowledge of an official proceeding or its federal nature and, as a result, influence the witness's testimony at that proceeding. The coincidence of this act and result will not suffice, however, for criminal liability to attach under this statute. Without at least a circumstantial showing of intent to affect testimony at some particular federal proceeding that is

ongoing or is scheduled to be commenced in the future, this statute does not proscribe his conduct.

The evidence is insufficient to support the convictions of either Mike or Renee Shively under count 9 of the indictment.

### 4. Count 10

 Count 10 alleged that the three defendants devised a scheme to defraud an insurance company by burning the Shively residence and its contents to collect insurance proceeds. To execute this scheme, count 10 further alleged that they transmitted interstate telephone conversations, in violation of 18 U.S.C. § 1343. Only Renee Shively disputes the sufficiency of the evidence on this count, contending that "[t]here is no evidence in the record that she made telephone calls from New Mexico to Odessa, Texas in the furtherance of a scheme or conspiracy."

A wire fraud offense under § 1343 requires proof of (1) a scheme to defraud and (2) the use of, or causing the use of, wire communications in furtherance of the scheme. *United States v. Herron*, 825 F.2d 50, 53–54 (5th Cir.1987). The wire communication need only be intended to further or to execute the scheme, and one phone call is sufficient to constitute an offense. *United States v. Pecora*, 693 F.2d 421, 424 (5th Cir.1982), *cert. denied*, 462 U.S. 1119, 103 S.Ct. 3087, 77 L.Ed.2d 1348 (1983). "Once membership in a scheme to defraud is established, a knowing participant is liable for any wire communication which subsequently takes place or which previously took place in connection with the scheme." *United States v. Westbo*, 746 F.2d 1022, 1025 (5th Cir.1984).

It has already been established that sufficient evidence implicated Renee Shively in this conspiracy, the aim of which was to defraud the insurance company. On June 21, 1984, only 18 minutes after the Shivelys checked into their hotel room in New Mexico, a three-minute call was placed to their residence in Odessa, presumably to inform Johnson their alibi was now in place. Viewed most favorably to the verdict, this evidence is clearly sufficient to affirm conviction under count 10.

### 5. Counts 12, 14, 15, and 16

Counts 11, 12, 14, 15, and 16 alleged that Mike Shively and Johnson devised "a scheme to defraud KBK Financial, Inc. and to obtain money by means of false and fraudulent pretenses, representations and promises." KBK was a Houston-based company engaged in the business of "purchasing" accounts receivable under a "factoring arrangement" from other companies needing immediate cash. Shively was the owner and manager of his trucking company, Best Services, and Johnson managed Best Services at certain times after the arson. Through Shively, Best Services entered into an agreement with KBK to sell KBK certain of its accounts receivable that KBK elected to purchase. Shively represented to KBK that after Best Services assigned accounts receivable to KBK, all efforts by Best Services to collect would cease and any payments on the accounts would be delivered to KBK within 24 hours of receipt. The indictment alleged that through false and fraudulent statements and representations, Shively and Johnson caused certain customers to remit payments to Best Services rather than KBK, and that they converted these payments to their own use.

The government charged that use of the mails to send letters and receive payments pursuant to this scheme constituted a violation of 18 U.S.C. § 1341. Specifically, count 12 alleged that Shively and Johnson caused Katty Industries to send a letter containing a check for $967.82; count 15 covered a letter from Quarles Drilling Corporation containing a check for $75.57; and count 16 covered a letter from Valero Producing Company containing a check for $775.00. Count 14 concerns a letter sent by Johnson to KBK while he was managing Best Services.

 To obtain conviction under § 1341, the government must prove (1) a scheme or artifice to defraud, (2) specific intent to defraud, and (3) the use of the mails for the purpose of executing the

scheme. *United States v. Aubrey,* 878 F.2d 825, 827 (5th Cir.), *cert. denied,* ─── U.S. ───, 110 S.Ct. 289, 107 L.Ed.2d 269 (1989). The proof of intent may arise by inference from all of the facts and circumstances surrounding the transactions. *Id.* To constitute use of the mails, the defendant need only "cause" their use. *United States v. Toney,* 605 F.2d 200, 205 (5th Cir.1979), *cert. denied,* 444 U.S. 1090, 100 S.Ct. 1055, 62 L.Ed.2d 779 (1980).

Significantly, neither Shively nor Johnson challenges conviction under counts 11 or 13. Count 11 sets out nine paragraphs outlining the scheme and the defendants' conduct therein. To constitute the violation under § 1341, the tenth paragraph alleges the specific mailing from another company of a check for $6,573.85. Counts 12, 14, 15, and 16 each contain two paragraphs, the first of which states that "[p]aragraphs one through nine of Count Eleven are hereby realleged and incorporated as though set forth in full herein, as constituting and describing the Defendants' scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises." The second paragraph under these counts then alleges the specific mailing constituting the violation. Count 13 charged Shively and Johnson with receiving and disposing of the proceeds from the count 11 offense knowing it to be "stolen, unlawfully converted and taken by fraud," in violation of 18 U.S.C. § 2315. Because there was no challenge to conviction under counts 11 and 13, we take it as established that the government has proven both a scheme to defraud and their specific intent to defraud.

Shively contends that, in regard to counts 12, 15, and 16, no evidence was presented that he ever saw these checks or had anything to do with them, and that they were endorsed not by him, but by Ronnie Coplen. However, his seeing or endorsing the checks was not an element requiring proof. Shively does not contend that the government failed to prove the use of the mails in this scheme to deliver the checks under these counts to Best Services. The government produced considerable testimony that he directed his company in its dealings with KBK, and that he was aware funds were being sent to Best Services and were not being relinquished to KBK. In fact, the proof demonstrates that the entire fraudulent scheme was designed to mislead customers into mailing to Best Services payments due to KBK. The evidence supporting Shively's convictions under counts 12, 15, and 16 is sufficient.

 Count 14 concerns a letter mailed by Johnson to KBK shortly after he began managing Best Services. KBK had just conducted an audit and taken custody of Best Services' financial records. Johnson wrote to the KBK president requesting proof of their contract, a copy of a life insurance policy on Mike Shively, and information regarding accounts receivable. Johnson contends that the government failed to prove that the mailing in count 14 was for the purpose of executing the fraudulent scheme. He also challenges the instructions given comprehending this count. Shively contends no evidence implicates him with this letter, which Johnson admitted signing and sending.

Johnson argues that his letter contained no untrue statements. While § 1341 requires a use of the mails for the purpose of executing the scheme, the statute "does not require that the material mailed be fraudulent in itself." *Henderson v. United States,* 425 F.2d 134, 142 (5th Cir.1970). Mailings designed to "lull" the victim into a false sense of security, or to postpone inquiries or complaints, or to make the transaction less suspect are mailings in furtherance of the fraudulent scheme. *United States v. Adkins,* 741 F.2d 744, 750 (5th Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2113, 85 L.Ed.2d 478 (1985); *United States v. Georgalis,* 631 F.2d 1199, 1204 (5th Cir.1980). The relevant inquiry is whether the mailings were "sufficiently closely related" to the fraudulent scheme to bring it within the scope of § 1341. *United States v. Maze,* 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974); *United States v. Toney, supra,* 605 F.2d at 205.

Johnson next asserts that this letter did not lull KBK Financial into a false sense of security. However, the failure of the letter to actually lull KBK does not relieve Johnson of criminal liability. *Adkins*, 741 F.2d at 750. Viewed most favorably to the verdict, a reasonable juror could have concluded that the letter was so intended. A request for records would indicate concern for the problem and that a solution was being sought. The consequent delay could allow the scheme to continue. The government presented proof that Johnson's letter to KBK in fact was sent after a letter from Best Services went out informing its customers that its relationship with KBK was terminated, and that all future payments should be mailed directly to Best Services. This evidence is sufficient to support Johnson's conviction. Johnson also challenges the district court's instructions under this count. However, his argument embraces the same erroneous interpretation of the law concerning "lulling letters."

Shively contends that he was not involved in the mailing of this particular letter. This court has held that "when an individual does an act with the knowledge that the use of the mails will follow in the ordinary course of business, or when such use can *reasonably be foreseen, even though not actually intended,* then he/she 'causes' the mails to be used." *United States v. Shaid,* 730 F.2d 225, 229 (5th Cir.), *cert. denied,* 469 U.S. 844, 105 S.Ct. 151, 83 L.Ed.2d 89 (1984) (emphasis added). Therefore, with the joint scheme and intent of Shively and Johnson established, a jury could find it reasonably foreseeable that Johnson, whom Shively brought in to manage Best Services, would continue to advance their scheme by use of the mails. Sufficient evidence supports Shively's conviction on count 14.**

## III

The convictions of Michael Roy Shively and Kim Renee Shively on count 9 are reversed. This cause is remanded for their resentencing accordingly. The judgment of the district court in all other respects is affirmed.

AFFIRMED in part, and REVERSED and REMANDED in part.

---

** Local Rule 47.5 provides: "The publication of opinions that have no precedential value and merely decide particular cases on the basis of well-settled principles of law imposes needless expense on the public and burdens on the legal profession." Pursuant to that rule, the court has determined that the remainder of this opinion, except for the summation in section III, should not be published.